IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SEAN MURPHY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No.   04 C 0552 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| JASON INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sean Murphy has filed a one-count complaint against defendant Jason Incorporated, alleging retaliatory discharge. Plaintiff seeks compensatory and punitive damages, and injunctive relief. Defendant has moved for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons discussed herein, defendant's motion for summary judgment is granted.

## FACTS[1]

Plaintiff Sean Murphy, a citizen of Illinois, was employed by Advance Wire Products ("Advance"), a division of defendant Jason Incorporated ("Jason"), from April 26, 1999, until his termination on April 17, 2003. Defendant is incorporated in Delaware, with its principal place of business in Wisconsin. Throughout his employment with defendant, plaintiff was an engineering manager for Advance, which produces wire form. The parties agree that the court has jurisdiction based on diversity of citizenship and an amount in controversy exceeding $75,000, pursuant to 28 U.S.C. § 1332.

---

[1] Unless otherwise noted, the following facts, taken from the parties' L.R. 56.1 statements and attached exhibits, are not in dispute.

In July 2002, Advance and representatives from the Occupational Safety and Health Administration ("OSHA") held an informal settlement conference relating to a December 2001 inspection that had resulted in a citation to Advance regarding foot pedals on an orbital riveter. During the meeting, Ron Stephens ("Stephens"), an OSHA compliance officer, viewed photographs of Advance's facility, and noticed that certain other Advance machines, including a fourslide machine, were not properly guarded.[2] Stephens subsequently inspected the fourslide machines and determined that the 70 to 75 fourslide machines needed to be guarded. Plaintiff had been assigned by Todd Marquith ("Marquith"), vice president and general manager of Advance, to function as the company liaison during Stephens's investigation. Plaintiff, on behalf of Advance, and Stephens agreed that the fourslide machines would be guarded within two years. Plaintiff memorialized this agreement in a letter that he sent to OSHA on July 26, 2002. The letter stated that the guarding project would be completed no later than July 15, 2004, and that Advance understood that, "OSHA may visit the Advance Wire facility every six months to monitor the progress of the program." OSHA did not issue a citation to Advance for the unguarded machines.

A team was formed at Advance to make decisions about the guarding project consisting of plaintiff, vice president of human resources Scott Wirig ("Wirig"), operations manager Tim Deady ("Deady"), Marquith, and president Robert Sandberg ("Sandberg"). Plaintiff was assigned the task of ensuring that the fourslide machines were guarded. Sandberg told plaintiff in late 2002 to have a prototype of the guards approved by OSHA before the other machines were guarded, and Marquith instructed plaintiff to make certain that the prototype guards were ready

---

[2]The court notes that neither party defines terms such as "orbital riveter" or "fourslide."

2

by January 7, 2003. Plaintiff believed that after the prototypes were completed, but before they were tested by Advance, OSHA should inspect them and notify Advance what, if any, changes had to be made. In contrast, Advance's management, including Sandberg, Marquith, Wirig, and Deady, thought that Advance should test the prototype guards for safety and productivity before OSHA inspected them, and that OSHA would not necessarily test the prototypes at all. Plaintiff concedes that Stephens did not state that he or OSHA was concerned with testing, but only that OSHA needed to approve the guards before they were installed on all of the machines.

According to plaintiff, the prototypes were ready for inspection by OSHA on or about January 3, 2003, and plaintiff announced this at a general managers' meeting on or about January 14, 2003. Plaintiff claims that the attendees at the meeting, including Sandberg, ignored his reference to OSHA. According to plaintiff, he "surmised that [Advance]'s senior management was no longer interested in complying with the OSHA requirements because Stephens left OSHA in 2002." In support of this statement, plaintiff asserts that in December 2002, Wirig mentioned to plaintiff that Stephens was no longer at OSHA and stated that it was possible that OSHA had forgotten about Advance's safety compliance issues. Defendant asserts that as of January 14, 2003, the prototypes designed by plaintiff did not comply with OSHA's requirements. In particular, others on the guard project team were concerned that the prototype did not prevent employees from injuring their hands. Plaintiff concedes that in January 2003, the prototypes that he had designed still permitted employees to get their hands caught in pinch-points, and that this problem was not corrected until after his termination.

On or about January 21, 2003, plaintiff informed Marquith that he was going to ask OSHA to inspect the prototype guards. Plaintiff testified at his deposition that Marquith

expressly said that going to OSHA was "not a good idea," and told plaintiff that he would be terminated if he did so. On February 3, 2003, plaintiff met with OSHA representatives Charles Shields ("Shields") and Merri Massie ("Massie") at the North Aurora OSHA office to request an OSHA inspection of the prototype guards. Shields and Massie gave plaintiff a letter stating OSHA's request that Advance forward videotape and photographs of the prototype guards to OSHA for approval. Plaintiff never forwarded this information to OSHA, and did not contact OSHA again after February 3, 2003, until after he was terminated. Plaintiff does not dispute that OSHA was already aware of the safety issue related to the guards at the time he met with Shields and Massie.

After the February 3, 2003, meeting, plaintiff informed Deady of the OSHA meeting and showed him a copy of OSHA's letter. According to plaintiff, later that day Deady expressed his disappointment and that of Marquith that plaintiff had met with OSHA. Deady also commented to plaintiff on February 3, 2003, that his overall job performance was "absolutely miserable," and gave plaintiff an unscheduled performance evaluation. According to defendant, Marquith and Deady had decided to put plaintiff on a performance improvement plan ("PIP") in mid-January 2003. Plaintiff was placed on a PIP on February 3, 2003. Also on February 3, 2003, Deady criticized plaintiff for not starting the guarding project sooner and for not preparing prototypes in a timely fashion that were ready for the expected OSHA spot check in January 2003.

On or about February 28, 2003, Deady presented plaintiff with a performance evaluation dated February 3, 2003. Plaintiff claims that the evaluation was backdated. In the February 3 evaluation, Deady stated that plaintiff's performance was substandard. The evaluation also increased plaintiff's expectations for a cost savings goal that had been in established in plaintiff's

January 3, 2003, evaluation. Plaintiff was terminated on April 17, 2003. The stated reason was poor performance. Prior to his February 3, 2003, evaluation, plaintiff had received at least four favorable performance reviews from 2000 to January 3, 2003.

After his termination, plaintiff filed a complaint with OSHA under section 11(c) of the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. § 651 et seq.[3] Plaintiff alleged in his 11(c) complaint that he had been terminated for "contacting the North Aurora office on February 3, 2003." OSHA investigated and ultimately dismissed plaintiff's 11(c) complaint. Plaintiff filed appealed of OSHA's decision, and OSHA denied his appeal.

As agreed to with OSHA in July 2002, all of Advance's fourslide machines were guarded by July 2004. Defendant was never cited by OSHA for failing to guard the fourslide machines.

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party

---

[3]Section 11(c) of the OSH Act contains a broad anti-discrimination provision that prohibits employers from retaliating against employees who file complaints. 29 U.S.C. § 660(c). An employee who believes that he has been discriminated against by his employer for filing a complaint may file a complaint with the Secretary of Labor under section 11(c). Id.

opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

## DISCUSSION

Plaintiff's complaint alleges that he was terminated in retaliation for contacting OSHA, in violation of "well-grounded public policy." In Illinois, an employer generally may terminate an at-will employee at any time without cause. See Paz v. Commonwealth Edison, 314 Ill. App. 3d. 591 (2nd Dist. 2000). The Illinois Supreme Court, however, has recognized the tort of retaliatory discharge as a narrow exception to the general rule of at-will employment. Jacobson v. Knepper & Moga, P.C., 185 Ill.2d 372, 376 (1998). "To establish a cause of action for retaliatory discharge, a plaintiff must demonstrate that: (1) he was discharged in retaliation for his activities; and (2) the discharge is in contravention of a clearly mandated public policy." Id., citing Palmateer v. Int'l Harvester Co., 85 Ill.2d 124 (1981) Defendant in the instant case argues that it is entitled to summary judgment because plaintiff cannot establish the second element of retaliatory discharge. For the reasons discussed below, the court agrees.

6

There is no precise definition of what constitutes "clearly mandated public policy," but Illinois case law has recognized retaliatory discharge actions in two situations. First, when an employee is discharged for filing, or intending to file, a claim under the Illinois Workers' Compensation Act. Id. Second, when an employee is discharged for reporting illegal or improper conduct, often called "whistle blowing." Id. Only the second scenario is relevant to the instant case. A plaintiff alleging retaliatory discharge for reported whistle-blowing must demonstrate that the law he claims to be the basis of the public policy enunciates a public policy that "plainly covers a situation to which the plaintiff objects." Stebbings v. Univ. of Chicago, 312 Ill. App. 3d. 360, 367 (1st Dist. 2000). The tort does not require the employee to have been correct about the unlawfulness of the conduct, so long as he had a good-faith belief that it was unlawful. Id. at 369-70. The question in the instant case, then, is whether plaintiff reported a violation of the public policy enunciated by the OSH Act.

The announced purpose of the OSH Act is to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). Defendant in the instant case essentially argues that plaintiff's actions were not in furtherance of the goals embodied in the OSH Act because plaintiff did not report a workplace hazard that affected health and safety. Defendant points to evidence that OSHA did not view the unguarded fourslide machines as urgent, including the fact that OSHA did not issue a formal citation to defendant regarding the guards and allowed Advance two years in which to rectify the problem. Further, plaintiff admits that OSHA was already aware of the lack of guards at the Advance facility when plaintiff met with Massie and Shields on February 3, 2003. Plaintiff conceded at his deposition that he "felt OSHA must have felt that [the fourslide machines] were safe enough

7

that it would get fixed over two years." Plaintiff also admits that he met with OSHA to gain approval of the prototypes, not to report a workplace or safety hazard risk.

Although it is undisputed that defendant was never out of compliance with its agreement with OSHA, plaintiff argues that he acted as a whistle-blower in the interest of the health and safety of Illinois citizens when he "attempted to place the guarding project back on the radar." Plaintiff fails, however, to produce any evidence other than his speculation that the guarding project had fallen off Advance's "radar." Plaintiff concedes that he was never told to stop working on the guarding project, and that during the time he worked at Advance work on the guarding project never stopped. Defendant's evidence establishes that it had not forsaken the project, and that it was not attempting in any way to eschew its responsibilities or avoid compliance with OSHA. Rather, other members of the guard project team simply did not believe the prototypes were ready for inspection as of January 2003. In particular, they were concerned that the design might allow employees to injure their hands, a concern which is supported by plaintiff's admission that the prototype did not prevent employees' hands from getting stuck in the machines. Lastly, the guarding project was completed within the time allotted by OSHA.

Plaintiff clearly disagreed with others at Advance, including his superiors, about when and how to present the prototypes to OSHA for inspection, based in part on plaintiff's perception of what OSHA inspectors required from Advance. The Seventh Circuit has recently held that an employee who acts on an idiosyncratic view of what state or federal law requires is not promoting a "clearly mandated public policy." Arres v. IMI Cornelius Remcor, Inc., 333 F.3d 812, 814 (7th Cir. 2003). In Arres, the plaintiff-employee disagreed with her supervisor's instructions on how to follow federal immigration law. The Seventh Circuit noted that an

employee is not free to impose a different approach than her employer unilaterally because "that's nothing but insubordination." Id. The court also noted, "Imagine the disruption in workplaces everywhere if every person were legally privileged to act (or not act) based on her own view of what the law (federal or state) requires, and managers were helpless to do anything in response." Id.

Like Arres, the instant case demonstrates the folly of such a system. Plaintiff here disagreed with his employer about how the guard project should proceed and what OSHA required. It is undisputed, however, that OSHA was already aware of the unguarded machines when plaintiff met with OSHA representatives on February 3, 2003, against the explicit instructions of his employer. In doing so, plaintiff was not acting as a "whistle-blower"; there was simply nothing on which to blow a whistle. Plaintiff's unilateral actions were "nothing but insubordination." Plaintiff has thus failed to create a triable issue of fact whether he was acting in furtherance of public policy by reporting a workplace hazard.

Accordingly, defendant's motion for summary judgment on plaintiff's complaint is granted. Because the court grants defendant's motion for summary judgment, it need not address whether the OSH Act preempts Illinois common law retaliatory discharge claims.

## CONCLUSION

For the reasons stated herein, defendant's motion for summary judgment of plaintiff's complaint is granted.

**ENTER:** **March 24, 2005**

**Robert W. Gettleman**
**United States District Judge**